UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

VENUS MCALLISTER,

                                        Plaintiff,

                                                                3:14-CV-01488
v.                                                              (TWD)

CAROLYN W. COLVIN
ACTING COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.
_____

APPEARANCES:                            OF COUNSEL:

LACHMAN, GORTON LAW FIRM                 PETER A. GORTON, ESQ.
*Counsel for Plaintiff*
1500 East Main Street
P.O. Box 89
Endicott, New York 13761

HON. RICHARD S. HARTUNIAN               KRISTINA D. COHN, ESQ.
United States Attorney for the          Special Assistant United States Attorney
Northern District of New York
*Counsel for Defendant*
Room 218
James T. Foley U.S. Court House
Albany, New York 12207

OFFICE OF GENERAL COUNSEL               STEPHEN P. CONTE, ESQ.
Social Security Administration          Chief Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## MEMORANDUM DECISION AND ORDER

Plaintiff Venus McAllister brings this action pursuant to 42 U.S.C. § 405(g) of the Social

Security Act ("SSA"), claiming that the Commission of Social Security ("Commissioner"),

improperly denied her application for Supplemental Security income ("SSI") and disability benefits. (Dkt. No. 1.) This case has proceeded in accordance with General Order 18 of this Court which sets forth procedures to be followed when appealing a denial of Social Security Benefits. Both parties have filed briefs.[1] Oral argument was not heard. Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States Magistrate Judge. (Dkt. No. 13.) For the reasons discussed below, the Court affirms the decision of the Commissioner and the Complaint (Dkt. No. 1) is dismissed.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on October 16, 1978. (Administrative Transcript at 41, 69.[2]) She graduated high school and attended one year of college. (T. at 41.) Plaintiff completed a medical assistant training program in 2008. *Id.* She lives with her five children. *Id.* Plaintiff previously worked as a customer service representative, manufacturing laborer, hotel housekeeper, cashier, and a self-employed event planner for private parties. (T. at 43, 231.) At the time of the hearing, she was working part-time as a housekeeper at a Holiday Inn. (T. at 46.) Plaintiff's alleged disability consists of left shoulder pain, tingling, and numbness, asthma, and back pain. (T. at 50, 230.)

On April 20, 2012, Plaintiff protectively applied for disability insurance benefits and SSI, alleging disability commencing December 5, 2011. (T. at 181-191.) Plaintiff's applications were initially denied, after which she timely requested a hearing before an Administrative Law Judge ("ALJ"). (T. at 69-86, 97-98.)

---

[1] Plaintiff's letter motion (Dkt. No. 14), requesting permission to file a reply brief, was granted and the reply brief (Dkt. 14-1) was considered. (Dkt. No. 15.)

[2] The Administrative Transcript is found at Dkt. No. 9. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the numbers assigned by the Court's CM/ECF electronic filing system.

On August 1, 2013, a hearing was held before ALJ F. Patrick Flanagan. (T. at 36-68.)

Plaintiff was represented by counsel. *Id.* On October 2, 2013, ALJ Patrick issued a written

decision finding Plaintiff not disabled under the SSA. (T. at 11-22.) On October 30, 2014, the

Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final

decision of the Commissioner. (T. at 1-3.) Plaintiff timely commenced this action on December

10, 2014. (Dkt. No. 1.)

## II. APPLICABLE LAW

### A. Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI

disability benefits must establish that he or she is "unable to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2015). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.

42 U.S.C. § 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority, 42 U.S.C. § 405(A), the SSA

promulgated regulations establishing a five-step sequential evaluation process to determine

disability. 20 C.F.R. § 416.920(a)(4) (2015). Under that five-step sequential evaluation process,

the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

The plaintiff-claimant bears the burden of proof regarding the first four steps. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). If the plaintiff-claimant meets his or her burden of proof, the burden shifts to the defendant-Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working. *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42

U.S.C. § 405(g) (2015); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). An ALJ must set

forth the crucial factors justifying his findings with sufficient specificity to allow a court to

determine whether substantial evidence supports the decision. *Roat v. Barnhart*, 717 F. Supp. 2d

241, 248 (N.D.N.Y. 2010);[3] *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "Substantial

evidence has been defined as 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d

Cir. 1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered

throughout the administrative record. *Featherly*, 793 F. Supp. 2d at 630; *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 30 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also include that which detracts

from its weight." *Williams*, 859 F.2d at 258 (citations omitted). If supported by substantial

evidence, the ALJ's findings must be sustained "even where substantial evidence may support

the plaintiff's positions and despite that the court's independent analysis of the evidence may

differ from the [ALJ's]." *Rosado*, 805 F. Supp. at 153. A reviewing court cannot substitute its

interpretation of the administrative record for that of the Commissioner if the record contains

substantial support for the ALJ's decision. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir.

1982).

---

[3] On Lexis, this published opinion is separated into two documents. The first is titled *Roat v. Barnhart*, 717 F.Supp.2d 241, 2010 U.S. Dist., LEXIS 55442 (N.D.N.. June 7, 2010). It includes only the district judge's short decision adopting the magistrate judge's report and recommendation. The second is titled *Roat v. Comm'r of Soc. Sec.*, 717 F.Supp.2d 241, 2010 U.S. Dist. LEXIS 55442 (N.D.N.Y. June 7, 2010). It includes only the magistrate judge's report and recommendation. Westlaw includes both the district court judge's decision and the magistrate judge's report and recommendation in one document, titled *Roat v. Barnhart*, 717 F. Supp. 2d 241 (N.D.N.Y. 2010). The Court has used the title listed by Westlaw.

### III. THE ALJ'S DECISION

The ALJ found that Plaintiff met the insured status requirements of the SSA through June 30, 2016, and that she had not engaged in substantial gainful activity since December 5, 2011, the alleged onset date of disability.[4]  (T. at 13.)  Based upon the "documented medical evidence of record, which consists of clinical and diagnostic findings," the ALJ determined that Plaintiff had the following severe impairments: left shoulder labral tear status post November 22, 2010, and August 2, 2012, surgeries, lumbar strain/sprain, and mild degenerative disc disease of the cervical spine with disc bulging.  (T. at 14.)  However, he found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (T. at 15.)  The ALJ next determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) and could occasionally reach overhead.  (T. at 15.)  The ALJ ultimately found that Plaintiff could perform her past relevant work as a customer service representative within her RFC and thus determined Plaintiff was not disabled within the meaning of the SSA.  (T. at 21-22.)

### IV. THE PARTIES' CONTENTIONS

Plaintiff argues that the RFC was unsupported by substantial evidence because (1) the ALJ erred by rejecting all medical opinions of record, thereby substituting his own opinion for competent medical opinion, and (2) the credibility analysis was incorrect.  (Dkt. No. 10.)

---

[4]  Plaintiff's net earnings from self-employment during 2012, as a private party planner were $9,876.00, which is "just under" substantial gainful activity.  (T. at 14.)  Plaintiff testified that she arranged at least two parties per month, devoting approximately sixty hours per month to this endeavor.  (T. at 44.)  Plaintiff also reported working fifteen to twenty-four hours per week as a housekeeper at a Holiday Inn in 2013.  (T. at 46.)

Defendant argues that the ALJ's decision applied the correct legal standards and is supported by substantial evidence, and thus should be affirmed. (Dkt. No. 11.)

## V.     ANALYSIS

### A.     The Medical Evidence

Plaintiff received treatment from August 2004 to July 2013 at Lourdes Center for Family Health mainly through two primary providers, Physician Assistant Thomas Burkert ("PA Burkert") and Physician Assistant Patricia Vincent ("PA Vincent"). (T. at 317-381, 532-579.) PA Burkert and PA Vincent generally followed Plaintiff for asthma, acne, low back pain, and left shoulder pain. (T. at 328-81, 532-79.) On October 22, 2008, Plaintiff was involved in an automobile accident. (T. at 298.) She was taken to Wilson Memorial Regional Medical Center in Johnson City, New York, and was assessed with a low back strain and a contusion of the left shoulder. (T. at 298-99.) X-rays of Plaintiff's lumbar spine and left shoulder were negative. (T. at 299, 302.) She was prescribed a pain medication. (T. at 299.)

On October 30, 2008, Plaintiff presented to PA Burkert for follow up. (T. at 354.) On examination, Plaintiff's extremities were normal bilaterally and equal in strength. *Id*. She had some pain on palpation of paravertebral musculature in the lumbosacral area. *Id*. She reported that her intermittent low back pain was improving. *Id*. She was advised to take warm soaks to the affected area, and was continued on pain medication. *Id*. PA Burkert assessed Plaintiff with a low back strain and a resolved contusion left shoulder. *Id*. On January 9, 2009, Plaintiff continued to complain of low back pain, but her left shoulder was resolved in terms of pain. (T. at 352.) As a precaution, PA Burkert ordered a MRI and requested an orthopedic consultation. *Id*.

Plaintiff was examined by Helen Harris, RPA-C ("PA Harris") of Tier Orthopedic Associates, P.C., on January 14, 2009. (T. at 304.) PA Harris noted that Plaintiff ambulated on her own accord, and there was no evidence of limping. *Id.* On examination, she had good motor function distally, no peroneal muscle weakness, and no sensation deficit. *Id.* The MRI of Plaintiff's lumbar spine was normal. (T. at 302.) PA Harris recommended physical therapy. (T. at 303.) Plaintiff returned on February 11, 2009, complaining of low back pain radiating to her knees. *Id.* Plaintiff denied chronic numbness, but stated that she occasionally had some numbness. *Id.* She had intact deep tendon reflex, and no sensation deficit distally bilaterally in her legs. *Id.* She had good range of motion of her knees, ankles, and hips. *Id.* She had some limited reproducible low lumbar pain. *Id.* PA Harris noted that she had not found anything on examination nor on testing that could explain or help Plaintiff's pain. *Id.*

On April 2, 2009, PA Burkert referred Plaintiff for a neurological evaluation. (T. at 349.) On April 28, 2009, Plaintiff was examined by Sowbhagyna L. Sonthineni, M.D., of Broome Neurosciences. (T. at 308-13.) Plaintiff complained of back pain and pain shooting down into her legs. (T. at 308.) On examination, she had full range of motion of the cervical spine and no paraspinal muscle spasms were noted. (T. at 309.) Her "shoulder shrug" was intact, bilaterally. (T. at 310.) She had 5/5 strength in all extremities. (T. at 310.) Her gait and station were normal. *Id.* Plaintiff was diagnosed as having a lumbar strain and sprain. (T. at 307.) On May 18, 2009, an electromyography ("EMG") and nerve conduction study ("NCS") of Plaintiff's lower extremities were normal and showed no evidence of any neuropathy or lumbosacral radiculopathy. (T. at 313.)

On November 4, 2009, Plaintiff returned to her primary care provider and was examined by PA Vincent. (T. at 345.) Plaintiff was assessed with lumbar strain and sprain with possible

radiculopathy. *Id.* Plaintiff was prescribed a muscle relaxant and was instructed to take Ibuprofen. *Id.* She was to return in a few weeks to discuss further pain management. *Id.*

Six months later, on April 21, 2010, Plaintiff presented to PA Vincent complaining of left shoulder pain and left knee pain. (T. at 343.) She reported some tingling and numbness down her left arm. *Id.* On examination, her left shoulder had good range of motion with "some pain" in the extremity. *Id.* She had good pulses bilaterally. *Id.* Her grips were equal bilaterally. *Id.* She had good range of motion above the elbow. *Id.* She had tenderness over the left knee. *Id.* She was advised to start physical therapy. *Id.* Plaintiff followed-up on May 12, 2010, and stated that she had been going to physical therapy twice a week. *Id.* She felt some improvement, although she was still uncomfortable. *Id.* Examination of her left shoulder showed adequate range of motion with pain. *Id.* Her grip strength was equal bilaterally. *Id.* PA Vincent recommended continuing physical therapy and following up in four to six weeks. *Id.*

Four months later, on September 2, 2010, Plaintiff returned, complaining of shoulder and knee pain. (T. at 339.) On examination, her left shoulder had tenderness in the posterior area and the upper arm, with good range of motion of the shoulder, elbow, and wrist. *Id.* Her grip was slightly decreased on the left compared to the right. *Id.*

On October 14, 2010, Plaintiff reported a pinching and stabbing sensation. (T. at 337.) She reported taking Motrin without any relief. *Id.* She denied numbness or tingling in her hand. *Id.* Plaintiff was prescribed pain medication, and instructed to ice and heat her shoulder. *Id.*

On October 27, 2010, Plaintiff presented to Dr. Brosnan of Tier Orthopedic Associates, P.C., for evaluation of her left shoulder. (T. at 413.) On examination, Plaintiff's supraspinatus strength was 5/5, and her external rotation strength was 5/5. *Id.* He noted that her shoulder x-rays were "unremarkable." *Id.* The October 29, 2010, MRI of Plaintiff's left shoulder showed

partial separation of the posteroinferior glenoid labrum, but the remaining labrum was intact and the study showed no evidence of discrete partial thickness or full thickness rotator cuff tear. (T. at 364.) Plaintiff was diagnosed with a posterior labral tear of the left shoulder and subacromial bursitis. (T. at 413.)

On November 22, 2010, Plaintiff underwent left shoulder glenohumeral arthroscopy, posterior labral repair, and subacromial bursectomy. (T. at 420.) Plaintiff returned to Dr. Brosnan for follow-up examinations on November 30, 2010, December 16, 2010, January 1, 2011, January 21, 2011, February 25, 2011, April 8, 2011, May 20, 2011, and July 1, 2011. (T. 422-429.) Dr. Brosnan authorized Plaintiff to return to work as a customer service representative on December 17, 2010. (T. at 423.) The encounter notes reflect that from December 2010 through July 2011, Plaintiff was attending physical therapy and working. (T. at 423-429.) On July 7, 2011, Plaintiff's supraspinatus strength was 5/5, and external rotation was 5/5. (T. at 429.) She had mild discomfort with impingement sign and had some discomfort with the cross arm adduction test. *Id.* At that time, she had completed physical therapy, and was advised to follow a home exercise program. *Id.* Dr. Brosnan prescribed pain medication. *Id.* From July 7, 2011, through May 11, 2012, Plaintiff did not seek medical treatment for her left shoulder.

On May 11, 2012, Plaintiff presented to PA Vincent, complaining of left shoulder pain "for years." (T. at 560.) She reported that physical therapy in the past seemed to help. *Id.* She denied any numbness or tingling in her fingers, although she reported that her hand up to her elbow did not feel normal. *Id.* Examination of her left shoulder showed decreased range of motion in all directions. *Id.* She had good grip strength bilaterally. *Id.* She had good capillary refill in all fingers. *Id.* She was referred back to Dr. Brosnan for evaluation. *Id.* PA Vincent prescribed pain medication. *Id.*

Dr. Brosnan examined Plaintiff on May 25, 2012. (T. at 547.) Plaintiff reported that over the past eight months, she had developed increasing discomfort and burning in her left shoulder. *Id.* On examination, her external rotation strength was 5/5, and supraspinatus strength was 5/5. *Id.* She had pain with the impingement sign, and mild discomfort with the cross-arm adduction test. *Id.* New x-rays were obtained, which were again "unremarkable." *Id.* Plaintiff was diagnosed with recurrent bursitis left shoulder. *Id.* She was offered a steroid injection. *Id.*

On June 20, 2012, Plaintiff returned to PA Vincent complaining of acne and left shoulder pain. (T. at 559.) She reported that the anti-inflammatory medication was not working. *Id.*

On June 22, 2012, Plaintiff treated with Dr. Brosnan and continued to complain of left shoulder pain. (T. at 508.) The June 27, 2012, MRI of Plaintiff's shoulder depicted an intact rotator cuff, some edema over the acromioclavicular joint, some strain of the subscapularis muscle, and no recurrent labral tear or new tear. (T. at 509-10.)

On July 3, 2012, Dr. Brosnan reviewed the MRI, and diagnosed Plaintiff with left shoulder impingement. (T. at 512.) On August 2, 2012, Plaintiff underwent a left shoulder arthroscopic subacromial decompression. (T. at 543-44.) The August 14, 2012, shoulder x-ray showed "satisfactory decompression and Mumford."[5] (T. at 542.) Dr. Brosnan's September 18, 2012, and October 23, 2012, progress notes indicate that Plaintiff was "work status unable." (T. at 540, 541.) On both dates, her external rotation strength was 5/5. *Id.* She was instructed to continue formal physical therapy, and she was prescribed pain medication. *Id.*

---

[5] The Mumford procedure, also known as distal clavicle excision or distal clavicle resection, is a medical operation performed to ameliorate shoulder pain and discomfort by excising the distal (lateral) end of the clavicle. (Dkt. No. 11 at 6 n.2.)

On November 27, 2012, Plaintiff complained of pain and numbness into the hand. (T. at 539.) Dr. Brosnan ordered an EMG and NCS of Plaintiff's left upper extremity, which were normal. *Id*. (T. at 519, 537.) She was to follow a home exercise program.

On February 19, 2013, Dr. Brosnan diagnosed Plaintiff with left shoulder rotator cuff tendonitis. (T. at 538.) On examination, Plaintiff's external rotation strength was 5/5, and supraspinatus strength 5/5. *Id*. She had a negative Tinel's sign (tingling sensation) over the wrist and elbow. *Id*. Dr. Brosnan reviewed the December 2012 EMG and NCS, and noted that there was no significant abnormality in the left upper extremity. *Id*. Dr. Brosnan prescribed a pain medication. *Id*. Plaintiff was given a "slip" limiting her to three, eight hour shifts per week. *Id*. She was to return on an as needed basis. *Id*.

On March 5, 2013, Plaintiff presented to the emergency room complaining of left shoulder pain. (T. at 471.) Emergency personnel reported that Plaintiff "works as a home health aide and feels like she may have pulled her left shoulder while lifting a patient." *Id*. Plaintiff had mild to moderate pain that was "restricting her range of motion." *Id*. At that time, she denied any numbness or weakness or paresthesias in her left upper extremity. *Id*. The encounter note indicated that "she is not looking for anything more than just time off from work . . . because . . . [she] feels like she cannot do any heaving lifting, like moving patients around while she is in acute pain." *Id*. On examination, there was anterior left shoulder tenderness with no evidence of any soft tissue swelling or edema. *Id*. There was no rash or crepitus. *Id*. Plaintiff's range of motion, however, was "significantly limited," especially on external rotation and abduction of the shoulder. *Id*. Her neurovascular structures were distally intact. *Id*. The remainder of the physical examination was within normal limits. *Id*. Plaintiff was assessed with chronic left shoulder pain. (T. at 472.) After being furnished pain medication, Plaintiff left the

emergency room in improved condition, and was given three days "off duty" from work, and instructed to follow up with Dr. Brosnan and PA Vincent.  *Id.*

On May 22, 2013, Plaintiff presented to Dr. Brosnan complaining of pain in the left shoulder, radiating down her arm.  (T. at 525.)  On examination, Plaintiff's external rotation strength was 5/5, and supraspinatus strength was 5/5.  *Id.*  She had 50 degrees of rotation of the neck bilaterally and her motor strength was 5/5 in biceps/triceps, wrist flexors, wrist extensors, and interossei.  *Id.*  Sensation was intact, and Plaintiff's deep tendon reflexes were symmetric.  *Id.*  X-rays were obtained of the cervical spine and no significant abnormalities were noted.  *Id.*

On June 18, 2013, Dr. Brosnan diagnosed Plaintiff with degenerative disc disease cervical spine and status post left shoulder decompression with rotator cuff tendonitis.  (T. at 532.)  She was prescribed pain medication.  *Id.*  There are no other records from Dr. Brosnan and he did not provide a medical source statement.

On July 31, 2013, Plaintiff presented to PA Vincent.  (T. 556.)  She reported that Dr. Brosnan "lets her work part-time at the Holiday Inn doing housekeeping."  *Id.*  The encounter note states that "she has no lifting restrictions, however, the patient feels she needs them . . . ."  *Id.*  She denied any numbness or tingling in her hands.  *Id.*  She rated her pain at a six on a scale of zero to ten, and reported that her level of pain typically ranges from five to ten on any given day.  *Id.*  On examination, the range of motion in the shoulder was greatly decreased in all direction.  *Id.*  She was unable to "get it up over her head."  *Id.*  She had some pain on rotation of the arm bilaterally.  *Id.*  She had tenderness over the anterior and lateral part of her shoulder.  *Id.*  No muscle spasms were noted.  *Id.*  She had mild cervical tenderness with good range of motion of the neck.  *Id.*  She was instructed to follow up with the orthopedist and PA Vincent.  PA

Vincent indicated that Plaintiff was "going to work with [her orthopedist] on limitations as far as lifting goes on the job."  *Id.*

### 1.  PA Vincent's Questionnaire

PA Vincent submitted a "Questionnaire" for the time period April 21, 2010, through July 31, 2013.[6]  (T. at 530-31.)  Although she had not seen Plaintiff since June 20, 2012, two months before her second surgery, PA Vincent opined that Plaintiff required more than one ten-minute rest period per hour, she would miss more than four days of work per month because of the pain, she could sit for four hours out of an eight-hour workday, that she should change positions between sitting and standing every thirty minutes, that she could stand/walk for six hours out of an eight-hour day, and that she could not lift any weight.  (T. at 530-31.)  However, handwritten next to the weight limitation, PA Vincent indicated that "[t]his should be determined by Ortho— Dr. Brosnan."  (T. at 531.)

PA Vincent also opined that the effect of pain and/or side effects of medication would cause moderate limitation in Plaintiff's concentration and ability for a sustained work pace.  (T. at 530.)  PA Vincent reported that Plaintiff was taking Ultram, which causes sedation and fatigue.  (T. at 531.)

### 2.  Dr. Magurno's Consultative Examination

At the request of the Commissioner, Plaintiff was examined by internal medicine consultant Dr. Magurno on June 5, 2012.  (T. at 430.)  Plaintiff reported injuring her left arm in a motor vehicle accident in 2008.  *Id.*  She had surgery in November, 2010.  *Id.*  She stated that she had physical therapy, both before and after the 2010 surgery, which did not help.  *Id.*  She had a

---

[6]  Previously, the Medical Source Statement sent to PA Vincent was returned blank, with a notation that Plaintiff's last examination was November 4, 2010, Plaintiff was irregular with appointments, and that she had not been seen in over eighteen months.  (T. at 317.)

cortisone injection on May 25, 2012, which also did not help. *Id*. However, she reported that heating pads and medication do help. *Id*. She described her base line pain levels at 8/10 and she reported numbness in her left arm and fingers. *Id*. She reported inflammation in the left shoulder. *Id*. She stated she could not perform household duties, and was unable to lift her daughter. *Id*. Plaintiff stated that her children do the cooking, cleaning, and laundry. (T. at 431.) However, she could grocery shop twice a month, and performed daily child care. *Id*. She showered and dressed six times a week. *Id*. She reported watching television and listening to the radio. *Id*. Plaintiff denied low back pain problems. (T. at 430.)

Dr. Magurno noted that Plaintiff was in no acute distress. *Id*. Her gait was normal, except the "absent swing of the left arm." *Id*. Plaintiff could walk on heels and toes with difficulty, her squat was 1/3, and her stance was normal. *Id*. She used no assistive devices, and needed no help changing for the examination, although she did not remove her socks. *Id*. Plaintiff needed no help getting on and off of the examination table. *Id*. She was able to rise from a chair without difficulty. *Id*.

On examination, Plaintiff's cervical spine showed full flexion, extension, lateral flexion 60 degrees bilaterally, and full rotary movement bilaterally. (T. at 432.) Plaintiff's lumbar spine showed flexion 50 degrees, full extension, lateral flexion bilaterally, and full rotary movement bilaterally. *Id*. The straight leg raise test was negative bilaterally. *Id*. She had full range of motion in her right shoulder. *Id*. Plaintiff's left shoulder had forward elevation 50 degrees, abduction 30 degrees, adduction 0 degrees, and external rotation 25 degrees. *Id*. Internal rotation was declined. *Id*. On the left shoulder, Plaintiff was tender to very light touch on the deltoid and over the anterior clavicle area. *Id*. She had full range of motion of the right elbow and forearm. *Id*. Her left elbow had flexion to 80 degrees, while pronation and supination were

full.  *Id*.  She had full range of motion of the right wrist.  *Id*.  Her left wrist had dorsiflexion and palmar flexion to 30 degrees, while radial and ulnar deviation were 10 degrees.  *Id*.  She had full range of motion in hips, knees, and ankles, bilaterally.  *Id*.  There was no evident subluxation, contractures, ankyloses, or thickening.  *Id*.  Her joints were stable.  *Id*.  There was no redness, heat, swelling, or effusion.  *Id*.

Plaintiff's deep tendon reflexes were physiologic and equal in upper and lower extremities.  *Id*.  On the right upper extremity and bilateral lower extremities, there was no sensory deficit noted.  *Id*.  On the left upper extremity, there was no sensation to light touch to the mid forearm and proximal to this, she only felt something at the medial elbow and lateral arm.  (T. at 432-33.)  Strength in her lower extremities and right upper extremity was 5/5.  (T. at 433.)  Plaintiff declined left upper extremity biceps and triceps testing.  *Id*.  Wrist dorsiflexion was 4-/5.  *Id*.  There was no cyanosis, clubbing, or edema.  *Id*.  Pulses were physiologic and equal.  *Id*.  There was no significant varicosities or trophic changes.  *Id*.  There was no evidence of muscle atrophy.  *Id*.

On examination of Plaintiff's fine motor activity, the thumb to finger dexterity on the right was intact.  *Id*.  Plaintiff reported that she was unable to do this on the left.  *Id*.  Her grip strength was 5/5 on the right and 3/5 on the left (not making a complete fist around the fingers).  *Id*.  Finger flexion on the right was 5/5 and on the left was 3/5.  *Id*.  Finger abduction on the right was 5/5 and 4/5 on the left.  *Id*.  She had difficulty using a zipper and a button on the left, and had difficulty tying a bow.  *Id*.

Dr. Magurno diagnosed Plaintiff with status post injury and subsequent surgery on the left shoulder and asthma.  *Id*.  Dr. Magurno did not review any diagnostic testing results.  *Id*.  Her prognosis was stable.  *Id*.  Dr. Magurno opined that there were (1) marked limitations for

left-sided reaching, pushing, and pulling as well as lifting, carrying, and squatting; (2) moderate limitations for bending; (3) marked limitations for left-sided grasping; and (4) moderate to marked limitations for left-sided fine motor activities.  *Id*.  Dr. Magurno stated that no other limitations were observed.  *Id*.

### B.       Opinion Evidence and the RFC Determination

A claimant's RFC is the most she can do despite her limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule.  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d 45, 42 (2d Cir. 1999) (quotations omitted)).

It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion. 20 C.F.R. §§ 404.1546(c), 416.946(c).  In determining RFC, the ALJ can consider a variety of factors including a treating physician's or examining physician's observations of limitations, the claimant's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe.  20 C.F.R. §§ 404.1454(a), 416.945(a).  Age, education, past work experience, and transferability of skills are vocational factors to be considered.  *Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999).  Physical abilities are determined by evaluation of exertional and nonexertional limitations.  Exertional limitations include claimant's ability to walk, stand, lift, carry, push, pull, reach, and handle.  20 C.F.R. §§ 404.1569a(b), 416.969a(b).  Nonexertional limitations include mental impairments and difficulty performing the manipulative or postural

functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). Once the ALJ has resolved a claimant's complaints of pain, he can then evaluate exertional and non-exertional limitations. *Lewis v. Apfel*, 62 F. Supp. 2d 648, 658 (N.D.N.Y. 1999).

The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004) (citation omitted). "In assessing RFC, the ALJ's findings must specify the functions a plaintiff is capable of performing; conclusory statements regarding the plaintiff's capacities are not sufficient." *Roat*, 717 F. Supp. 2d at 267 (citation omitted). "RFC is then used to determine the particular types of work a claimant may be able to perform." *Whittaker*, 717 F. Supp. 2d at 440.

As set forth above, the ALJ found that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) because Plaintiff can sit for about seven hours in an eight-hour workday, stand and/or walk for about six hours in an eight-hour work day, lift and/or carry twenty pounds occasionally, lift and/or carry ten pounds frequently, and occasionally reach overhead. (T. at 15.) In making this determination, the ALJ considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529, 416.929, and SSR 96-4p and 96-7p. (T. at 16.) The ALJ also considered the

opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527, 416.927, and SSR 96-2p, 96-6p, and 06-3p. *Id.*

Plaintiff argues that the RFC was not supported by substantial evidence because the ALJ essentially gave no discernable weight to any of the medical opinions of record, and instead, substituted his own opinion for those of all medical providers. (Dkt. No. 10 at 6.[7]) Specifically, Plaintiff argues that the ALJ erred in giving "no weight" to the opinion of orthopedic provider, Dr. Brosnan, "no weight" to the opinion of primary care provider PA Vincent, and "little weight" to the opinion of the consultative examiner, Dr. Magurno, thus begging the question, "what's left?" *Id.* Plaintiff argues that because there are no other medical opinions of record, the "only logical conclusion" is that the ALJ interpreted the "raw medical data" himself, and formed his own RFC determination. *Id.* The Court disagrees.

1.  Dr. Brosnan

Contrary to Plaintiff's characterization of the ALJ's decision, the ALJ does not essentially reject all medical opinion of evidence. Rather, the ALJ appropriately afforded certain of the opinions "no weight" or "limited weight." (T. at 19-21.) After providing a thorough discussion of Plaintiff's medical history, the ALJ assigned "no weight" to Dr. Brosnan's opinion on September 18, 2012, and October 23, 2012, that Plaintiff was "work status unable." (T. at 19-20.) The ALJ noted that Plaintiff had just undergone surgery on August 2, 2012, so he viewed these "restrictions" to be "at most temporary in nature." (T. at 20.) The ALJ further noted that Plaintiff testified that she continued to work as a self-employed party planner in 2012, except during the month of August. (T. at 20, 45.) Moreover, to the extent that Dr. Brosnan's opinions speak to the ultimate issue of disability, they are not entitled to special deference since the

---

[7] Citation to page numbers in the parties' briefs refer to the original page numbers rather than to the page numbers assigned by the Court's CM/ECF electronic filing system.

regulations specifically reserve that issue to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999).

The ALJ also assigned "no weight" to the opinion rendered by Dr. Brosnan on February 19, 2013, limiting Plaintiff to three, eight-hour shifts per week. (T. at 20.) The ALJ discounted this limitation because Plaintiff testified that she had already been working such a schedule as a housekeeper for nearly two months at the Holiday Inn. (T. at 46-47.) The ALJ also found that there were no objective clinical findings to justify this limitation. (T. at 20.) On February 19, 2013, Dr. Brosnan examined Plaintiff's left shoulder and reported that her external rotation strength was 5/5, her supraspinatus strength was also 5/5, Tinel's sign was negative over her wrist and elbow, and the EMG and NCS showed no significant abnormality in her left upper extremity. (T. at 522.) Because this work limitation was not supported, nor consistent with other substantial evidence, the ALJ was under no obligation to afford deference to this opinion. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2014) (deference to treating source's opinion was not required where treating physician issued opinions that were not consistent with other substantial evidence in the record); *see also Florek v. Commissioner of Social Security*, No. 1:08-CV-0919, 2009 WL 3486643, at *10, 2009 U.S. Dist. LEXIS 98126, at *31 (N.D.N.Y. Oct. 21, 2009) ("the fact that the ALJ did not accept every limitation indicated by [the doctor] is not a ground for reversal or remand").

2.    PA Vincent

Initially, physician assistants are not considered "acceptable medical sources to establish whether you [the claimant] have a medically determinable impairment(s)." 20 C.F.R. §§ 404.1513, 416.913; *see also* Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *2 (SSA Aug. 9, 2006) (information from other sources cannot establish the existence of a

medically determinable impairment). Evidence from other sources such as a physician assistant's opinion may be used to demonstrate the severity of a claimant's impairment(s) and how it affects a claimant's ability to work. 20 C.F.R. §§ 404.1513, 416.913(d)(1). However, the opinions of such other sources are not entitled to controlling weight inasmuch as they are not "acceptable medical sources." *Id.*

Nevertheless, the opinions of other sources such as a physician assistant must be considered because the court is required to evaluate all evidence that comes before it. *Id.* at §§ 404.1527(c), 416.927(c). In some situations, the opinions of other sources may be entitled to some extra consideration. *See Kohler v. Astrue*, 546 F.3d 260, 268-69 (2d Cir. 2008) (finding that the nurse practitioner's opinion should have been given some consideration because she was the only medical professional available to claimant for long stretches of time in the very rural North Country); *but see Diaz v. Shalala*, 59 F.3d 307, 316 (2d Cir. 1995) (finding that the ALJ did not have to give controlling weight to a chiropractor's opinion). The ALJ should explain the reasons for the weight given to these opinions, or otherwise ensure that the discussion of the evidence in the decision allows a claimant to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. SSR 06-03p, 2006 WL 2329939, at *6.

The factors required for analysis of a treating physician's opinion (20 C.F.R. §§ 404.1514(d), 416.927(d)) can also be applied to opinion evidence from other sources. SSR 06-03p, 2006 WL 2329939, at *4. These factors include: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of

expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion.  *Id.*

Here, the ALJ placed "no weight" on PA Vincent's July 31, 2013, Questionnaire.  (T. at 530.)  The ALJ highlighted that PA Vincent's extreme functional limitations were inconsistent with PA Vincent's and Dr. Brosnan's treatment notes that Plaintiff had good strength and good range of motion.  (T. at 423, 426-29, 507, 512, 516-18, 522.)  For example, PA Vincent opined that Plaintiff required more than one ten minute rest period per hour, that she would have four or more absences per month, that pain and/or the side effects of Plaintiff's medications would have a moderate effect on her concentration and ability to sustain work pace, that she could sit for four hours, that she should change positions between sitting and standing every thirty minutes, and that she could not lift any weight.  (T. at 530-31.)  Although PA Vincent opined that Plaintiff could never lift any weight, she indicated that any lifting restriction "should be determined by ortho--Dr. Brosnan."  (T. at 531.)  Moreover, the July 31, 2013, encounter note reflects that Plaintiff "has no lifting restrictions, however, the patient feels she needs them . . . ."  (T. at 556.)  PA Vincent also noted that Plaintiff was "going to work with orthopedics on limitations as far as lifting goes [at the Holiday Inn]."  *Id.*  The ALJ also noted that the remainder of PA Vincent's opinions were speculative and not based on any objective testing or clinical findings.  (T. at 21.)  The ALJ properly afford weight to PA Vincent's opinions that were supported by her treatment notes, such as Plaintiff's ability to stand/walk for six hours out of an eight hour work day.  (T. at 20.)

Here, the Court finds that the ALJ gave good reasons for assigning certain of PA Vincent's no weight.  (T. at 20-21.)  In this case, the ALJ properly considered and discounted PA Vincent's opinion for its inconsistency with other medical evidence and unsupported, speculative

opinions. *Id.* Further, PA Vincent noted that Plaintiff was irregular with appointments, including an eighteen month period, from November 4, 2010, until May 11, 2012, wherein PA Vincent did not treat Plaintiff. (T. at 317.) Accordingly, the Court finds that ALJ gave good reasons for assigning PA Vincent's Questionnaire "no weight." (T. at 20-21.)

### 3. Dr. Magurno

The ALJ properly accorded "little weight" to Dr. Magurno's opinion, noting that the examination took place shortly after the flare-up of Plaintiff's left shoulder pain that occurred in May, 2012, and shortly before Plaintiff's surgery that occurred in August, 2012. (T. at 21.) Dr. Magurno's opinion was also inconsistent with her examination of Plaintiff. For example, although Plaintiff had reduced left shoulder range of motion and tenderness, she was neurologically intact, had near full strength in her left upper extremity, and no muscle atrophy throughout. (T. at 432-33.) Dr. Magurno's opinion that Plaintiff had marked limitations for left side-grasping and moderate-to-marked limitations for left-sided fine motor activities was also inconsistent with her examination and Plaintiff's testimony.

On examination, Dr. Magurno found Plaintiff's thumb to finger dexterity was intact on the right, and Plaintiff self-reported that was unable to do this on the left. (T. at 433.) Dr. Magurno noted that Plaintiff had difficulty using a zipper and a button on the left, and had difficult tying a bow. *Id.* However, Plaintiff needed no help changing for the examination, and she reported needing no assistance dressing in her Function Report. (T. at 239, 431.) Plaintiff further reported that she ironed and washed dishes, and prepared meals. (T. at 240-41, 248.) She folded laundry while sitting down. (T. at 64.) Plaintiff reported talking on the phone and using a computer, as a customer service representative and to socialize with family and friends. (T. at 65, 243.) She drives a car. (T. at 241, 248.) She also shopped in stores, by phone, mail, and

computer.  (T. at 242.)  She reported using both her right and left hands to operate the television remote control.  (T. at 64.)  Moreover, Dr. Magurno's limitations were inconsistent with Plaintiff's ongoing work activity, including self-employment as a private event planner.  (T. at 21, 43-44, 471-72, 548, 558.)  In addition, EMG and NCS studies of Plaintiff's left upper extremity performed December 12, 2012, were normal.  (T. at 519-21.)

Plaintiff further argues that a vocational expert should have been consulted in light of Dr. Magurno's opinion that Plaintiff had moderate to marked limitation to left-sided fine motor activities.  (Dkt. No. 10 at 13.)  However, because the ALJ properly afforded Dr. Magurno's opinion limited weight and the RFC was supported by substantial evidence, the ALJ was under no obligation to consult a vocational expert.

Here, the ALJ properly accorded little weight to Dr. Magurno's opinion and Plaintiff's argument that a vocational expert should have been consulted is without merit.  *See Pelam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013) (ALJ properly declined to credit certain conclusions in consultative examiner's opinion that were inconsistent with other evidence of record).

### 4. Substantial Evidence

In this case, Plaintiff argues that the ALJ interpreted raw medical data, and thus improperly formed Plaintiff's RFC.  (Dkt. No. 10 at 6.)  The Court disagrees.  To be sure, the ALJ does not need to assign a specific weight to a medical opinion, so long as the Court is able to discern the ALJ's reasoning.  *Curtis v. Colvin*, No. 11-CV-1001 (GLS), 2013 WL 3327957, at *5, 213 U.S. Dist. LEXIS 92615, at *15 (N.D.N.Y. July 2, 2013) ("[D]espite the lack of specific weight assigned to the opinions, the court is able to discern with east the ALJ's reasoning, and his treatment of that evidence will not be disturbed.").  Here, it is clear from the ALJ's decision that he reviewed the record in its entirety, appropriately weighed the evidence, and addressed

inconsistencies between Dr. Brosnan's opinions, and the objective medical evidence, as well as the opinions of PA Vincent and Dr. Magurno. Accordingly, the Court is "able to readily glean the rationale for the ALJ's decision." *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."). Moreover, under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support her position. Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record. *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).

In determining the RFC, the ALJ must make a decision based on all of the relevant evidence, including a claimant's medical record, statements by physicians, and a claimant's description of his limitations. *See* 20 C.F.R. § 416.945(a). Although an ALJ will consider medical opinions on a claimant's function, ultimately the ALJ is tasked with reaching an RFC assessment based on the record as a whole. 20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-6p, 1996 WL 374180, at *1-2 (SSA July 2, 1996). Significantly, the ALJ's RFC finding need not track any one medical opinion. *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). Moreover, certain findings, including the

ultimate finding of whether the claimant is disabled, are reserved to the Commissioner. *Snell,* 177 F.3d at 133; 20 C.F.R. § 416.927(d).

Plaintiff further argues that there is a gap in the record, and at the very least, the ALJ should have recontacted Dr. Magurno to obtain an updated evaluation of Plaintiff after the second surgery performed on August, 2, 2012, or should have contacted Dr. Brosnan concerning Plaintiff's post-surgery functioning. (Dkt. No. 10 at 9.) The Court disagrees.

The ALJ has a duty to affirmatively develop the administrative record in light of the nonadversarial nature of a benefits proceeding, regardless of whether the claimant is represented by counsel. *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (citations omitted). This includes a duty to contact treating and other medical sources to clear gaps in the record. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Id.* (citations omitted). Remand for gaps in the record is appropriate only where the court is unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision. *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) (citations omitted). Moreover, any obligation of the ALJ to develop the record must be weighed against the fact that the claimant bears the burden at the first four steps and must sufficiently demonstrate that her impairments meet the definition of a disability. *See Kohler*, 546 F.3d at 265.

Here, the Court finds that there was no gap in the administrative record, and that there was ample evidence in the record, including Dr. Brosnan's and PA Vincent's treatment records after the August 2, 2012, surgery to enable the ALJ to render a decision regarding Plaintiff's

medical condition.  (*See* T. at 307-79.)  Accordingly, there was no need for the ALJ to recontact Dr. Brosnan or Dr. Magurno regarding Plaintiff's post-surgery functioning.

Based upon the above, the Court finds that the ALJ properly evaluated the medical evidence of record and that the RFC determination was supported by substantial evidence.

### C.        Credibility Evidence and the RFC Determination

Plaintiff also argues that the ALJ's credibility determination was not supported by substantial evidence.  (Dkt. No. 10 at 14-22.)  In addition to reviewing the medical evidence in determining the RFC, the ALJ must review the credibility of the claimant.  The Court reviews an ALJ's findings of fact under a substantial evidence standard.  "It is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."  *Aponte v. Sec'y, Dept. of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citation and internal punctuation omitted).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  20 C.F.R. §§ 404.1529, 416.929; *Genier*, 606 F.3d at 49; SSR 96-7p, 1996 WL 374186, at *5 (SSA July 2, 1996).  The ALJ is required to consider all of the evidence of record in making his credibility assessment.  *Genier*, 606 F.3d at 50 (citing 20 C.F.R. §§ 404.1529, 404.1545(a)(3)).

First, the ALJ must consider "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms."  SSR 96-7p, 1996 WL 374186, at *2.  This finding does not involve a determination as to the intensity, persistence, or functionally limiting effects of the claimant's pain or other symptoms.  *Id.*  If no impairment is found that could reasonably be expected to produce pain, the claimant's pain cannot be found to affect the claimant's ability to do basic

work activities.  *Id.*  An individual's statements about his pain are not enough by themselves to establish the existence of a physical or mental impairment, or to establish that the individual is disabled.  *See Grewen v. Colvin*, No. 1:11-CV-829, 2014 WL 1289575, at \*4, 2014 U.S. Dist. LEXIS 41260, at \*10 (N.D.N.Y. Mar. 27, 2014) (while a "claimant's subjective complaints are an important part of the RFC calculus . . . subjective symptomatology by itself cannot be the basis for a finding of disability . . . [and] [a] claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptoms alleged."); *see also* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p.

Once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been established, the second step of the analysis is for the ALJ to "consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with other objective medical evidence and other evidence."  *Genier*, 606 F.3d at 49 (quoting 20 C.F.R. § 404.1529(a)); *see also Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (finding that claimant's subjective complaints of pain were insufficient to establish disability because they were unsupported by objective medical evidence tending to support a conclusion that he has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms); *see also* SSR 96-7p, 1996 WL 374186, at \*5 ("One strong indication of the credibility of [an individual's statements is their] consistency, both internally and with other information in the case record.").  This includes evaluation of the intensity, persistence, and limiting effects of the pain or symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities.  *Genier*, 606 F.3d at 49.

The ALJ must consider all evidence of record, including statements the claimant or others make about his impairments, his restrictions, daily activities, efforts to work, or any other relevant statements the claimant makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony during administrative proceedings. *Id.* (citation omitted).

A claimant's "symptoms can sometimes suggest a greater level of severity than can be shown by the objective medical evidence alone." SSR 96-7p, 1996 WL 374186, at *3. When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve pain or symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to pain symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

After careful consideration of the evidence, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (T. at 17.) However, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limited effects of the alleged symptoms were not entirely credible. (T. at 17-19.) The Court agrees with the Commissioner that the ALJ's credibility finding was proper and supported by substantial evidence. (Dkt. No. 13 at 11-13.)

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis*, 62 F. Supp. 2d at 651 (quoting *Gallardo v. Apfel*, Civ. No. 96-9435, 1999 WL 185253, at *5, 1999 U.S. Dist. LEXIS 4085, at *15 (S.D.N.Y. Mar. 2, 1999)); *Ferraris*, 728 F.2d at 587. "A finding that a [claimant] is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams*, 859 F.2d at 260-61 (citation omitted) (finding that failure to make credibility findings regarding claimant's critical testimony undermines the Secretary's argument that there is substantial evidence adequate to support his conclusion that claimant is not disabled). "Further, whatever findings the ALJ makes must be consistent with the medical and other evidence." *Id*. at 261 (citation omitted) ("[A]n ALJ must assess subjective evidence in light of objective medical facts and diagnoses.").

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier*, 606 F.3d at 49 (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). The ALJ's evaluation of a plaintiff's credibility is entitled to great deference if it is supported by substantial evidence. *Murphy v. Barnhart*, Civ. No. 00-9621, 2003 WL 470572, at *10, 2003 U.S. Dist. LEXIS 6988, at *30 (S.D.N.Y. Jan. 21, 2003) (citing *Bischof v. Apfel*, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999)); *Bomeisl v. Apfel*, Civ. No. 96-9718, 1998 WL 430547, at *6, 1998 U.S. Dist. LEXIS 11595, at *19 (S.D.N.Y. July 30, 1998) ("Furthermore, the ALJ has discretion to evaluate a claimant's credibility . . . and such findings

are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing.").

In making his credibility assessment, the ALJ considered the entire record, consisting of the objective medical evidence, Plaintiff's statements, and other relevant evidence in the record, including written statements authored by Plaintiff's husband, Cornelius McAllister, and her sisters, Latesha Kirkman and Xiomara Garces. (T. at 17-19); *see* SSR 96-7p, 1996 WL 374186, at *1 (SSA July 2, 1996). The ALJ applied the appropriate standards in assessing the credibility of Plaintiff's statement regarding the severity of her symptoms and limitations, and he explained the many reasons why he found Plaintiff's testimony not entirely credible. (T. at 17-19.)

First, the ALJ noted that Plaintiff's claims of disability were not supported by, and were inconsistent with the objective medical evidence. (T. at 18.) This included Plaintiff's lumbar spine x-rays and MRI which were negative, the EMG and NCS of Plaintiff's lower extremities and left upper extremity which were normal, and the cervical spine x-rays and MRI which showed nothing more than mild discogenic disease with two small bulges. *Id.* Second, the ALJ found Plaintiff's testimony inconsistent and exaggerated, specifically noting that Plaintiff testified she experienced five bad days a week, but was able to work three days a week. *Id.*

Third, the ALJ found Plaintiff's complaints inconsistent with the clinical signs and findings on examination. *Id.* For example, on June 18, 2013, Plaintiff exhibited some mild left shoulder pain and a reduced range of motion in her neck, but her external rotation strength was 5/5, her supraspinatus strength was 5/5, her motor strength was 5/5, her sensation was intact, and her reflexes were equal. (T. at 528.) On July 31, 2013, Plaintiff displayed a decrease range of motion in her left shoulder, but exhibited only mild cervical tenderness with a good range of motion in her neck, and denied any numbness or tingling in her hand. (T. at 556.)

Fourth, the ALJ found Plaintiff's activities of daily living inconsistent with her complaints of disability. (T. at 18.) The ALJ noted that Plaintiff performed child care on a daily basis, shopped in stores, showered, dressed, watched television, listened to the radio, drove herself and her children, cooked on occasion, prepared food for parties, used a computer, and took care of pets. (T. at 41, 239, 431.) Plaintiff also testified that she went to the movies, attended family functions, and occasionally went swimming with her children. (T. at 56.)

Fifth, Plaintiff worked at a number of jobs since her alleged disability onset date of December 5, 2011, including planning, catering, and throwing private parties, as well as working as a housekeeper at a Holiday Inn. (T. at 18.) Plaintiff's work involved cleaning bathrooms, making beds, and dusting. (T. at 275.) At the hearing, Plaintiff testified that she was not required to push a cart or lift more than five pounds as a housekeeper. (T. at 47.) However, PA Vincent's July 31, 2013, encounter note reflects that Plaintiff currently had no lifting restrictions, although she felt she needed them. (T. at 556.) On March 5, 2013, Plaintiff sought emergency department care because she had injured her left shoulder lifting a patient while working as a home health aide. (T. at 472.) At the hearing, Plaintiff denied lifting patients. (T. at 48.) This inconsistency in her ability to work and lift further supports the ALJ's credibility finding. *See* SSR 96-7p, 1996 WL 374186, at *5 (a strong indication of a claimant's credibility is the consistency of her statements, and accordingly, the adjudicator may compare statements made by the individual in connection with her claim for disability benefits with statements she made under other circumstances).

Sixth, the ALJ determined that the evidence of record showed that Plaintiff's pain symptoms were "well controlled" by medication, specifically noting that Plaintiff reported on March 3, 2013, that her pain medication "worked wonderfully." (T. at 18, 472.)

Seventh, Plaintiff received unemployment insurance benefits subsequent to her alleged disability onset date. (T. at 206-24.) Although not determinative with respect to the issue of disability, the ALJ noted that the fact Plaintiff continued to certify that she was ready, willing, and able to work does little to enhance her credibility. (T. at 19); *see Deboer v. Astrue*, 5:11–CV–1359 (GLS), 2012 WL 6044847 at *4, 2012 U.S. Dist. LEXIS 172440, at *12 (N.D.N.Y. Dec. 5, 2012) ("an ALJ may consider evidence that the claimant received unemployment benefits and/or certified that she was ready, willing, and able to work during the time period for which she claims disability benefits as one factor relevant to assessing her credibility") (collecting cases). The ALJ also noted that Plaintiff attended the hearing without any noted distractions or overt pain behavior, and responded to questions in an appropriate manner. (T. at 19.)

Here, Plaintiff essentially argued that the ALJ did not properly account for her pain by overlooking her 2011 physical therapy treatment.[8] (Dkt. No. 10 at 16.) Plaintiff further argues that the ALJ mischaracterized the facts by erroneously stating that Plaintiff "did not seek any medical treatment for her left shoulder [from November 22, 2010] until November 11, 2012. (T. at 17.) Plaintiff argues that the ALJ used Plaintiff's alleged lack of ongoing treatment "against" Plaintiff, constituting prejudicial error. (Dkt. No. 10 at 16.) The Court disagrees.

---

[8] The record shows that Plaintiff attended physical therapy at Southern Tier Physical Therapy from January 20, 2011, through June 21, 2011. (T. at 581-604.) On January 20, 2011, Plaintiff reported that her pain was "getting a little better." (T. at 581.) On January 27, 2011, Plaintiff's therapy session was limited due to time constraints, and Plaintiff "having [eight] children with her." (T. at 587.) On February 4, 2011, Plaintiff's session was again limited because her "infant was fussy." (T. at 588.) On February, 11, 2011, the progress report indicated that Plaintiff continued to leave her appointment early. (T. at 589.) On April 7, 2011, Plaintiff was seen for re-evaluation. (T. at 592.) She had not been to therapy since February 14, 2011, due to scheduling conflicts. *Id.*

While the ALJ did not specifically discuss Plaintiff's physical therapy treatment, her complaints of pain were discussed in detail throughout the ALJ's decision. (T. at 16-21.) Moreover, an ALJ is not required to explicitly set forth and analyze every piece of evidence in the record. *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.") (internal quotation omitted).

Here, the ALJ found that Plaintiff's allegations of disabling symptomatology were not credible to the degree alleged. (T. at 17.) The ALJ determines issues of credibility, and deference should be given to his judgment because he heard Plaintiff's testimony and observed her demeanor. *See Garrison v. Comm'r of Social Sec.*, No. 08-CV-1005, 2010 WL 2776978, at *5-7, 2010 U.S. Dist. LEXIS 70411 (N.D.N.Y. July 14, 2010). Based upon the above, the ALJ did not err in his assessment of Plaintiff's credibility. Accordingly, the Court finds that Plaintiff's RFC is based upon proper legal standards and is supported by substantial evidence.

After carefully reviewing the entire record and for the reasons stated, the Commissioner's denial of benefits applied the correct legal standards and was based upon substantial evidence. 20 C.F.R. §§ 404.1520(g), 416.920(g). Therefore, the Court affirms the decision of the Commissioner.

## VI.     CONCLUSION

For the reasons set forth above, the Court **DENIES** Plaintiff's motion for judgment on

the pleadings (Dkt No. 10), **GRANTS** Defendant's motion for judgment on the pleadings (Dkt.

No. 11), and **DISMISSES** the Complaint (Dkt. No. 1).


**IT IS SO ORDERED**.

Dated:  March 22, 2016
        Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge